Alfred DUKE, Petitioner,

v.

**UNITED STATES of America,**
**Respondent.**

No. 75 Civ. 160.

United States District Court,
S. D. New York.

May 20, 1975.

Alfred Duke, pro se.

Paul J. Curran, U. S. Atty., Southern District of New York, New York City, for respondent; Jeremy G. Epstein, Asst. U. S. Atty., of counsel.

OPINION

IRVING BEN COOPER, District Judge.

Petitioner Duke moves, pursuant to 28 U.S.C. § 2255, to vacate the sentence imposed by this Court upon a judgment of conviction entered against him.

On October 1, 1971 Duke was charged in a three-count indictment, 71 Cr. 1135, with conspiracy, bank embezzlement, and bank robbery in violation of 18 U.S.C. §§ 371, 656 and 2113(b) respectively. He was tried before this Court and a jury and convicted on all three counts on April 12, 1972. On May 10, 1972 we committed him for a ninety-day study pursuant to 18 U.S.C. § 4208(b). Upon receipt and careful consideration of the results of that study, the Court, on August 23, 1972, sentenced Duke to five years imprisonment on each count, the sentences to run concurrently. Duke's conviction was affirmed without opinion.[1]

Duke raises two claims in his present petition. First, he alleges the Court erred by denying him and his attorney access to any presentence report which the Court considered. Second, that the Court when imposing sentence relied on misinformation of constitutional magnitude by taking into consideration convictions incurred while Duke was a juvenile and unrepresented by counsel.

### 1. Duke's protest

Duke's first claim, that the sentence should be vacated because he was denied access to the pre-sentence reports,

1.  United States v. Duke, 469 F.2d 1404 (2d Cir. 1972).

is without merit. Although there is authority in support of general disclosure of pre-sentence reports made by probation offices, such disclosure under Fed. R.Crim.P. 32(c)(2) rests in the sound discretion of the sentencing Judge to be exercised on a case-by-case basis. United States v. Brown, 470 F.2d 285 (2d Cir. 1972). The Court in *Brown* ruled that although a blanket policy of refusing to disclose pre-sentence reports would run afoul of Rule 32(c)(2), (since "that is not an exercise of discretion on an individual basis"), the disclosure requirements of Rule 32(c)(2) would be satisfied where the sentencing Judge revealed to the defendant or his counsel the substance of the pre-sentence report. *Id.* at 288. See, United States v. Virga, 426 F.2d 1320 (2d Cir. 1970); United States v. Holder, 412 F.2d 212 (2d Cir. 1969).

■ In the present case, the Court's practice clearly complied with *Brown*, *Virga* and *Holder*, *supra*. After denying defense counsel's application to review the pre-sentence report (Tr. 438–39)[2], we stated:

And so the application to examine the confidential report in this case is denied, but by the time I get through reciting what I am going to recite, the defendant will have before him the most important feature of the total material considered by the Court; so that as a matter of discretion and policy, I am denying the application, but on my own I am imparting the essential features which I took into consideration. (Tr. 439)

We then proceeded to read into the record substantial extracts from three different probation reports, thereby divulging "significant portions" (Tr. 439) of a report made by the United States Probation Office for the District of New

Jersey ("New Jersey report") after Duke there pleaded guilty to a one count indictment charging him with wire fraud. (Tr. 439)[3] The specifics of the charge against Duke were placed on the record:

The one-count indictment charges that on or about October 6, 1969, the defendant and co-defendant devised a scheme to obtain money by means of false and fraudulent pretense, through the sale of four hundred shares of American Cyanamid Co. common stock, which stock certificates had been stolen. They transmitted by telephone in interstate commerce from New York, New York, to Newark, New Jersey, to collect the proceeds from the sale of the stolen stock certificates.

On or about January 3, 1969, a large amount of American Cyanamid stock certificates and IBM stock certificates were stolen from the office of Merrill Lynch, Pierce, Fenner & Smith, Inc., New York.

At the time, the defendant, Albert Duke, was employed by Merrill Lynch; the stock certificates were stolen from an area wherein Duke worked.

In late August or early September 1969, the co-defendant was introduced to Duke through a mutual friend. At the time, White—that is the co-defendant—was seeking a means of making money. Duke instructed the co-defendant to open various accounts in the co-defendant's name in brokerage firms, both in New York City and New Jersey. Duke further advised White and [sic] White would receive twenty-five per cent of the moneys to be realized from the sale of the stocks. The remaining seventy-five per cent of the moneys were to be paid to Duke. (Tr. 439–440)

2. The notation "Tr." refers to pages of the sentencing record of August 23, 1972.

3. Duke interrupted his trial on Feb. 16, 1970 and pleaded guilty to a charge of selling stolen stock certificates in violation of 18 U.S.C. § 1343. Duke was sentenced on Feb. 19, 1971 to five years imprisonment, execution of sentence suspended and placed on probation for five years.

## 2. Duke's juvenile record

We turned next to set out Duke's background as portrayed in the New Jersey report. Our outline revealed Duke's juvenile record (he was born February 25, 1946):

1955, he was brought into court; the matter was adjusted.

1957, again for juvenile delinquency. The charge was dismissed. He was charged on that occasion of breaking into a school building and causing damage amounting to a thousand dollars.

Again in 1957, juvenile delinquency. In that instance, the defendant, with four other youths, broke into a school building and stole twelve dollars in currency. He was placed on probation. Discharged November 15, 1957 with an unfavorable adjustment.

In 1958, February, again juvenile delinquency, with loitering around a junior high school building in Harlem and throwing a chair at a teacher. Petition dismissed.

In March of 1958, juvenile delinquency, assaulting a teacher inside a school building. He was in that case placed on probation, discharged on December 1, 1958, with an unfavorable adjustment.

In January of 1959, assault. At that time, he was charged with assaulting a teacher with a leg of a chair. Placed on probation, discharged February 1, 1960.

In 1963, robbery and assault. He and another were charged with being armed with a pistol and mugging a bank guard, stealing a knife, cigarette lighter, a wristwatch, seventy dollars and a pistol.

Later the same day, they mugged another man, from whom they stole a wristwatch and thirty dollars. The sentence, committed September 26, 1963, for five year term, served at Great Meadows Correctional Institutional [sic] Comstock, New York. (Tr. 441–442)

We need not ask ourselves what official inquiry was made concerning this defendant when, long before attaining his majority, he was arrested, rearrested and convicted on several occasions for behavior of a serious nature, tantamount to felonious conduct if committed by an adult. For so inadequate were the professional services available then and there, and so negative his cooperation, that the disposition of his cases—his challenges—were in effect addressed exclusively to the offenses charged. It may have been that no proper inquiry was made on any occasion as to who he really was. Why did he commit his act? What was there in his experience to turn him criminal? What of his home, his relations with parents, siblings and neighbors? With social institutions? With peer groups? With friends and boon companions? Who influenced him and after whom did he mold himself? What variety of activities did he participate in? Most important of all, what variety of opportunities was open to him? Did he participate in his culture? What interests did he then have? What skills? Whom did he love or hate? Inadequate answers to these and related questions posed the dilemma of his future deportment. In all likelihood, nothing was done to prevent reinfection by a truly therapeutic and creative supervision.

The courts before which he then made his appearance were generally without the essential tools for making an appropriate disposition for both defendant and community. In the main they still are. We pay dearly for injecting "bigness" into the house of the law. Said Judge Learned Hand, "If we are to keep our democracy, there must be one commandment—thou shalt not ration justice." After all, a legally established degree of offense is an unsatisfactory index of moral potential; in many cases the sickness of the soul that induced the crime is not cured by a fine or imprisonment.

It is in those courts that, with adequate professional services, early identi-

fication of the determined offender can be made, and lessen (if not avoid) the period of suffering for the community while he is establishing his intention by a long series of unreported, unrecognized and unpunished offenses. The stake which the community has in the potential recidivist is that he should not actually become one. Ineptitude in their treatment can go far in miseducating an entire generation. It is among the tragic limitations of our humanity that faced with evil, we must willy-nilly "treat" the condition first, "prevent" it next, and at long last, by understanding, renounce its charms.

### 3. Duke's recidivism

These charges in Duke's juvenile record beginning when Duke was only nine years old formed merely a prelude to Duke's subsequent adult career in crime. And so, we read into the record (on sentence) the adult criminal offenses nearly word for word as set out in the New Jersey report:

Now let's take a look at his adult record.

In September of 1965, assault in the third degree. On that occasion he assaulted a city marshal by striking [him] about the head and body with his clenched fist. He received a suspended sentence.

In April of 1967, violation of parole. Parole was reinstated.

April of 1967, petit larceny, criminally receiving and resisting arrest.

On June 16, 1967, the charges were dismissed in light of the defendant's arrest for new criminal charge. The new criminal charge was petit larceny. The defendant had in his possession four cameras and lens which had been stolen, with an aggregate value of $1,800. The sentence, six months. (Tr. 442–443)

Other portions of the New Jersey report, in addition to his criminal record,

illustrate Duke's criminal character. In particular, Duke habitually misrepresented, even where the questions bore tangential relationship to the sentence to be imposed. As an example, we recited how Duke was careless with the truth in regard to his educational background:

The defendant's education was interrupted by his incarceration, and while at Great Meadows Correctional Institution he received his high school equivalency certificate. He subsequently attended the Bronx Community College located on 184th Street, from February to June 1966, and then quit.

Defendant has stated to the probation officer and other authorities that he received an Associate of Arts degree from the Bronx Community College and a Bachelor of Science degree from Columbia University.

The records from Bronx Community College show he attended there for only four months and was not awarded a degree. As to Columbia University, the records division states there is no record that Duke ever attended there. (Tr. 443) [4]

Duke's long criminal record of recidivism and constant misrepresentation are perhaps made intelligible when viewed in the light of his emotional health. We pointed up the report's most significant findings on that score:

[W]hile at the Great Meadows Correctional Institution, he [Duke] was diagnosed as suffering from a personality trait disturbance with a passive-aggressive personality. They felt the prognosis for his future adjustment was guarded. "Emotionally we felt Duke to be rather unstable. He seems to regard any interview situation as an intellectual challenge, wherein he must challenge the interviewer rather than make an effort to understand his own problems and talk about them. He was unable to accept

---

4. In addition, Duke falsely claimed he had registered with the Selective Service Board

(Tr. 444), and that he was part owner of a store. (Tr. 444).

any form of criticism. He appeared to have an opinion that he must be the dominating character in every situation. He left us with the impression that he is unable to accept any responsibility and lacked insight.["] (Tr. 443–444)

We next revealed to Duke on sentence the substance of the probation report which was prepared by the Probation Office for the Southern District of New York after Duke was convicted on the October 1971 indictment. In the report, the probation officer assigned described Duke as

an extremely shrewd individual, very wise, constantly rationalizing and completely devoid of any remorse. (Tr. 446)

The report also revealed that

the defendant was arrested in Mount Vernon on September 5, 1971, originally stopped for vehicle and traffic violations. He was subsequently charged with having a forged driver's license, assaulting the Westchester County Parkway policeman with his fists and slamming the car door on the policeman's wrist, and in the trunk of the car were cartons of cigarettes totalling twenty thousand or more cigarettes, which were in unstamped packages, and also for resisting arrest.

He made bail, was finally indicted, failed to report to the Court on April 17, 1972. A bench warrant was issued. We advised the Westchester County authorities as to his present whereabouts. (Tr. 446)

### 4. The 4208(b) study

We regarded it only fair to defendant to record at sentence portions of the report submitted to us pursuant to our order directing the § 4208(b) study, noting that Duke had been committed for study in order to discover: "Who is he? What goes on in his head? What makes him do this? Can he control it?" (Tr. 444) Furthermore, although the Court "heard the testimony . . . listened to the scheming operations and machinations of this defendant and . . . had concluded what they reveal in their report," (Tr. 446) we wanted to be completely sure that Duke was not disturbed mentally.

What do they say? The case worker, under date of July 10, 1972, includes this:

"Defendant is in excellent physical health. A psychiatric examination fails to reveal any obvious indication of mental illness in the usual sense. Duke has a strong tendency to use past events as justification for undesirable acts, and that this is accompanied by a rebellion against authority. Able to manipulate his conscience in order to justify past acts. Failure to learn from experience. Lack of demonstrable loyalty to individuals, groups or social values and repeated conflict with society.

"He is diagnosed as an anti-social personality, and there is no evidence that a program of psychiatric intervention would be of any value to Duke at this time." (Tr. 447)

Continuing, we revealed at sentence the findings of the psychiatrist who had interviewed Duke pursuant to his commitment study:

What does the M.D. psychiatrist have to say that is significant? "Although there was some evidence of concreteness of thought and of rather vague symbolism, there was no solid evidence of psychosis. Thought processes, mood and relationship to others were all within normal limits. He appears to be quite intelligent and to be capable of good judgment. However, it appears that there is a strong tendency to use past events as justification for his undesirable acts and that this is accompanied by rebellion against authority. Able to manipulate his conscience in order to justify past acts, failure to learn from experience, conflict with groups or social values and with society." (Tr. 447–448)

Evaluations made by the treating clinic's director were next placed on record;

after summarizing Duke's educational background and work record, he then stated in his report:

"Clinical findings indicate that Mr. Duke is mentally competent. He possesses average intelligence and is viewed as a sophisticated, manipulative offender. He is characterized as an irresponsible and aggressive young man, who has demonstrated little remorse for his involvement in this offense." (Tr. 448)

The Court's disclosure, now completed, was described by Duke's counsel as an "exhaustive exposition." (Tr. 449) This recitation fully satisfied the requirements of *Brown, supra*, and indeed afforded Duke the functional equivalent of actual disclosure of the pre-sentence report. Accordingly, the Court rejects Duke's first claim of error.

### 5. The determined offender

The determined offender against the "peace and dignity of the people" presents a challenge not to be evaded. The right to move safe and unmolested through the city, to be secure at work and at home, to be protected against frauds and schemers, is the supreme luxury of civilization. For it the community pays a huge price, and is intolerant of failure or lag on the part of its agents and instruments. It cannot be patient with or concerned about the welfare of offenders while they threaten its security.

The charter of courts is in the law. Courts, having defined the intent of laws, must execute them within the tolerances which they permit. Laws define the acts which the community considers reprehensible. The community, in registering abhorrence by a punishment based on loss of freedom, is in effect alerting its members to the wisdom of self-control. Arrest demonstrates that the situation had become unsatisfactory to society, or to the delinquent, or to both.

We hold our legal processes in high regard as instruments of moral instruction and discipline. It makes a difference how people are arrested, and charged, and bailed; what they do between arrest and trial; who helps or does not help them; what future is presented to them; what aids offered to realize it; what supports an attorney enlists for them, or medicine supplies; how the judge interprets to offenders the attitude of society toward their faults; the character of the discipline measured out, and the climate of its administration; most important of all, how the offender is assured that he is not cast out of society, but he can elect to stay out. We hold that all these values inhere in the legal process and can be realized.

The court's asset as an instrument for prompt hearings and trials can become a liability if it lacks the essential aids needed for determining the circumstances on which crimes were based and out of which they grew, the degree of the defendants' educability, and the best and quickest means for returning them to or for removing them from the community.

Without taking full cognizance of the pulsating problems of life which lie behind names, charges and numbers of cases, no real estimate of what confronts us here can be gleaned. And we must recognize that a legally established degree of offense is an unsatisfactory index of moral potential; that the percentages of "cures" obtained with our present pharmacopoeia of corrective ingredients and dosages are profoundly discouraging; and that the hazards to courts, communities and offenders in treating offenses rather than persons are considerable.

### 6. Duke's second complaint

Duke's second contention is that the Court erred by considering in the sentence several convictions incurred by Duke while a juvenile, during which time he lacked the assistance of counsel. Duke now maintains that the sentence imposed was based on "misinformation of constitutional magnitude" within the meaning of United States v. Tucker, 404 U.S. 443, 92 S.Ct. 589, 30 L.Ed.2d 592 (1972).

In order for the Court to give Duke's contention any weight, we would be forced to assume, for purpose of argument, two questionable propositions. First, the Court is required to assume that the right to counsel provisions of In re Gault, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967), are fully retroactive, a determination we do not make here.[5] Second, we would be required to recognize *Tucker* as directly applicable where there has been no prior adjudication in which Duke's convictions were "conclusively determined . . . [to be] constitutionally invalid," 404 U.S. at 444–445, 92 S.Ct. 589. See Wilson v. United States, 504 F.2d 59 (6th Cir. 1974).

Even assuming *arguendo* Duke's threshold premises, we are constrained to deny his claim based on *Tucker* in view of the post-*Tucker* decision in Wilsey v. United States, 496 F.2d 619 (2d Cir. 1974), which calls for the sentencing judge to make

> brief findings as to (1) whether the presentence report contained the challenged convictions [under *Tucker*]; and (2) if so, whether the [Judge] would have given a different sentence if he had known they were constitutionally invalid. *Id.* at 619.

■ In the instant case, (1) the presentence reports did contain the challenged convictions; (2) most emphatically, we would not have directed a different sentence even if we had affirmatively known that the challenged convictions were or would be held constitutionally invalid. In this context, the facts of conviction or dismissal of the juvenile charges against Duke were indeed insignificant when compared with the circumstances of his prior adult federal and state criminal convictions, the findings on the § 4208(b) study which confirmed, *inter alia*, the insensitiviy of Duke to dispositions other than incarceration and Duke's conviction on all three counts on Indictment 71 Cr. 1135, establishing beyond a reasonable doubt his criminal involvement (for the second time) with the theft of securities, on this occasion worth more than $1,000,000.

The Court considered Duke's juvenile record not for the specific charges against him as a juvenile, or the mere number of such charges or even whether he was determined by lawful process and procedure to be adjudicated a juvenile delinquent, but rather with respect to what insight such background offered as to the appropriate disposition of the instant case against Duke, with all his strengths and weaknesses as he stood before the Court for sentence. After all, we had before us the pre-sentence reports, the results of the § 4208(b) study, Duke himself during trial and at two sentencings, all of which we considered.

### 7. The plight of the young in court

We would be sadly remiss if we failed on this particular occasion to comment judicially upon the dreadful consequences to community and defendants alike where, as with Duke, offenders, starting at any early age (Duke began at 9), make frequent court appearances in juvenile court in response to their involvement in serious criminal situations, only to continue during youth and adulthood a career of crime eventually leading to the status of the determined offender. As we have already noted (at point 2), Duke's juvenile court record was extensive, each time in connection with a serious matter (tantamount to a felony if committed by an adult), each time "he walked out of court" before, at age 17, he was committed to a correctional institution. Then we see him, starting at young adulthood and into maturity, establish a record of criminal recidivism to the point of becoming (if not already actually so) a determined offender. (point

5. See, however, United States v. Norcome, 375 F.Supp. 270 (D.D.C.1974), which held that "[s]ince *Gault* extends the Sixth Amendment protection of Gideon [v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963)] to juveniles and since *Gideon* is retroactive, it follows that such part of *Gault* which relates to the right of counsel for juveniles should likewise be applied retroactively." *Id.* at 292.

3) At what point did "things go wrong?" Was it all Duke's fault? Did the courts "let him down" or was it a combination of both?

### 7a. The difficult challenges

A considerable group is made up of individuals who exist at a low degree of mental and emotional tone, or are "high" and "provocative." When pressed beyond a certain point they frequently must be institutionalized. The help of a friendly and understanding guide often provides just the support needed to enable them to continue to live in the community for years. The stories of some of these people resemble a kind of moral tightrope walking over a precipice—so amazing are the powers of self-healing given the slightest encouragement.

Others are morally immature. Some are desperately ignorant. Others are adventurous and foolhardy. Still others are unconvinced that every evil collects a toll, and really believe that the lawbreaker who "gets away with it" has profited. This group is susceptible to education, but not of the one shot variety. There is a small minority for whom the offense and its aftermath have carried elements of excitement and glamour more rewarding than painful.

But the great mass of such offenders consists of persons who have not made very good use of their opportunities and who are prone to give vent to their feelings at slight provocation. They accept the easiest way out trying situations. They have never really faced up to life as a challenge. Often there is "spread before [us] in all its inevitable sequency, * * * a story of the rake's progress more implacable than any that was ever painted by a Hogarth". Their reactions range from the warm-heartedness and good-will of the effervescent through the coldly logical self-centeredness of the intellectuals, resigned inertia of the quietest, the reckless license of the philanderers, and the savagery of the smashers and fighters.

So many seem to show the marks of delayed adolescence, of failure to accept responsibility, of purposelessness in the face of life and destiny. At the threshold of maturity they express what they feel to be the temper of their generation in two biting phrases: "myself alone and nobody else!" and "collecting my subsistence—the main thing." The temper is one of generalized irresponsibility. We do not know how generalized irresponsibility is generated and how communicated. It has the qualities of a filterable virus. Its symptoms are obvious enough. The infected express themselves unmistakably.

A common factor in most of these cases is that, set against the life situation, the criminal charge lacks major importance. Where there is so much deep-seated misery one additional increment does not seem to matter too much. False knowledge to the full, hatred for authority (which is an aspect of their disease), and alternate periods of self-pity and blame paralyze their wills.

We must face up to it: Youth and young adult offenses are the bud stage of criminality. They follow in the main patterns of adult desires. But they are less cerebral, less variegated and more lusty. To consider youthful crime as something foisted on a completely innocent and law abiding community rather than as an aspect of its own thought of itself and its own action, is to be naive, indeed. We have it from Dr. Albert Schweitzer that when it comes to influencing others, especially the young, "example is not the main thing; it is the only thing."

### 7b. A desperate need

They (the young in court) have a long potential for good as well as for evil. But the potential is in them—not in their act. For instance, sentencing the offense rather than the person plunges certain young people headlong into hatred, revolt, community-repudiation—into something approaching self-destruction, i. e., moral suicide. Society then has lost a son, and gained a wastrel whose depredations have been known to affect the lives of many and to cost millions.

Regardless of the degree of crime, the extent of their character deterioration must be inquired into by the Court so as to ascertain the probable nature of the remediable measures needed to meet the condition determined. We believe that proper "post-operative care" requires the same careful scrutiny as the steps taken during the trial. That was a purpose of the § 4208(b) examination we ordered here.

Meaningfully encouraged, many will comment on the social situation in which their crimes had been incubated and matured. A helping hand, not a "handout," very frequently produces the proper ending of any truly developmental process—school, hospital, probation, apprenticeship—to have been freed of some incubus, to be prepared for life's challenges, and to have acquired the assurance of being able to meet them. The Court, insofar as it is able to reflect the immutable will of society to be protected against willfulness, and society's readiness to receive those healed of their moral infirmities back into the community, must be counted among our most important instruments of moral regeneration.

We ignore at our peril the imperative that the Court must be able to identify the youthful and young adult offender with good moral potential, who can be safely returned to the community to line up with the orderly citizen, from the hairtrigger, perverted or psychopathic first or young offender who needs institutionalized care.

### 8. Conclusion

We are just as convinced now of the validity of our observation as we were when at sentence we addressed Duke:

> You are not looking at your own flaws. You are not looking at your own deficiencies. You are hiding and running away from it all the time. You are covering it up. (Tr. 456)

> \* \* \* \* \* \*

And so you see, Duke, the Judge is concerned about holding up a mirror to you. You should see what it is that is dragging you down. You've got a good head. Everybody agrees with that. You are throwing it into the discard. You have become manipulative, clever, antagonistic. You bowl over everybody who interferes with your program of dishonesty. (Tr. 458)

Without hesitation, and after a thorough review of the record and the Court's own action in the sentencing of Duke, we find without merit Duke's claim that we would have altered our sentence if we had known that his juvenile adjudications were "infirm;" his motion is denied in all respects.

So ordered.